**K.C. 1986 LIMITED PARTNERSHIP,**
Plaintiff,

v.

**READE MANUFACTURING,**
et al., Defendants,

v.

**Habco, Inc., et al., Third–**
Party Defendants.

**No. 93–1062–CV–W–5.**

United States District Court,
W.D. Missouri,
Western Division.

Sept. 16, 1998.

Charles F. Speer, Armstrong, Teasdale, Schlafly & Davis, Kansas City, MO, for K.C. 1986 Limited Partnership.

Carl H. Helmstetter, Elaine D. Koch, Spencer Fane Britt & Browne, LLP, Kansas City, MO, John Bradley Leitch, Sonnenschein, Nath & Rosenthal, Kansas City, MO, Barry S. Sandals, Morrison & Foerster, San Francisco, CA, for Reade Manufacturing.

Thompson Coburn, St. Louis, MO, Ian P. Cooper, Peper, Martin, Jensen, Maichel & Hetlage, St. Louis, MO, Michele B. Corash, Barry S. Sandals, Morrison & Foerster, San Francisco, CA, Sean J. Mahoney, Morrison & Foerster, San Francisco, CA, Joseph R. Colantuono, Wehrman & Colantuono, L.L.C., Leawood, KS, for U.S. Borax, Inc.

Carl H. Helmstetter, Elaine D. Koch, Spencer Fane Britt & Browne, LLP, Kansas City, MO, for Remacor.

David E. Shay, Shughart, Thomson & Kilroy, P.C., Kansas City, MO, Joel P. Brous, Shughart, Thomson & Kilroy, P.C., Kansas City, MO, for Nancy Reade Forster.

Joe B. Whisler, Susan Elizabeth McKeon, Cooling & Herbers, P.C., Kansas City, MO, Edward L. Smith, Theresa Shean Hall, Knipmeyer, McCann, Smith, Manz, & Gotfredson, Kansas City, MO, Donald G. Scott, Edward R. Spalty, Charles F. Speer, Armstrong, Teasdale, Schlafly & Davis, Kansas City, MO, Joanne M. Barbera, Cooling & Herbers, Kansas City, MO, for Habco, Inc.

Edward L. Smith, Theresa Shean Hall, Knipmeyer, McCann, Smith, Manz, & Gotfredson, Kansas City, MO, Donald G. Scott, Edward R. Spalty, Charles F. Speer, Armstrong, Teasdale, Schlafly & Davis, Kansas City, MO, for Donald E. Horne.

## ORDER

LAUGHREY, District Judge.

Pending before the Court is Hardee's Food Systems, Inc.'s ("Hardee's") Motion for Summary Judgment on the claims asserted against it in this action, which include claims asserted by U.S. Borax ("Borax") in its Amended Cross–Claim under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), (Count I and II), the Resource Conservation and Recovery Act ("RCRA") (Count III), declaratory judgment (Count IV), negligence (Count V), contribution (Count VI), indemnity (Count VII) and unjust enrichment (Count VIII) and claims asserted by K.C.1986 Limited Partnership ("K.C.1986") in its Second Amended Complaint for negligence (Count III), strict liability for ultra-hazardous activities (Count IV), nuisance (Count V), contribution (Count VII), indemnity (Count VIII), unjust enrichment (Count IX) and contractual indemnity (Count X). Also pending is Borax's Cross–Motion for Summary Judgment on its CERCLA claims against Har-

dee's. Although this case is currently stayed pending approval by the United States Environmental Protection Agency ("EPA") of a remedial plan to clear up the site at issue, the Court is resolving certain pending motions at the request of the parties in an effort to expedite the dispute.

## I. Background

K.C.1986 has owned property located at 2251 Armour Road in North Kansas City, Missouri (the "Site") since December 1986. From 1963 to 1968, Borax leased the Site from a previous owner, Reade Manufacturing ("Reade"). Both Borax and Reade used the Site to store and blend chemicals used in herbicides. The Site was also used by Habco, Inc. ("Habco") and its predecessors to manufacture herbicides. In 1988, Hardee's began investigating the possibility of purchasing the Site from K.C.1986 for use as a restaurant. In 1988–1989, it was common in Kansas City for potential purchasers or lessees of commercial real estate to undertake some type of pre-acquisition environmental investigation. The scope and extent of work performed in these investigations varied considerably. Hardee's contacted and eventually retained Terracon Environmental, Inc. ("Terracon") to conduct a pre-acquisition environmental investigation.

The contract entered between Hardee's and Terracon provides that Terracon "shall furnish all labor, supervision, machinery, equipment, materials and supplies necessary" and "shall be solely responsible for all materials, equipment, tools and work until the project is completed." The contract further provides that Terracon "shall conduct all operations in [Terracon's] own name and as an independent contractor, and not in the name of, or as an agent for Hardee's."

Before the parties agreed to the scope and cost of the work to be done by Terracon, Terracon submitted several written proposals to Hardee's, the first of which is dated October 7, 1988. Terracon's initial proposal contemplated (1) a records review of state and federal environmental regulatory agencies to detect any history of environmental problems at the Site, (2) a title search to identify previous owners and historical land usage, (3) visual observation for signs of contamination, (4) tank, vat and floor sampling, (5) drilling and sampling, (6) well construction, (7) chemical analysis, (8) data evaluation, and (9) a final report. In the October 7, 1988 letter from Terracon to Hardee's outlining Terracon's initial proposal, Terracon noted that "[t]his property has a history of commercial development involving companies which regularly handled chemical commodities." In a revised proposal for environmental investigation set forth in a letter dated December 21, 1988 from Terracon to Hardee's, Terracon stated, "the work scope has been developed to sample for contamination in an area where it may likely be present, based upon Terracon's knowledge of the site." In an undated letter by Hardee's concerning the scope of Terracon's investigation, Hardee's wrote, "As previously discussed, we are not prepared to spend this much money given the fact that a preliminary on site inspection revealed high evidence of contamination. We are, however, going to have Terracon analyze a grab sample to substantiate their suspicions." In connection with its investigation, Terracon was present on the Site during all or part of approximately seven to 10 days between October 1988 and September 1989. The amount of time Hardee's representatives were also present at the Site is disputed.

On April 5, 1989, Hardee's made a Freedom of Information Act ("FOIA") request to the EPA requesting information "pertaining to chemical, asbestos, petroleum, or other contamination you have investigated or know of at the [Site]." Thereafter, on June 15, 1989, Hardee's and K.C.1986 entered into a "Ground Lease" for the Site. The Ground Lease states that "Subject to the satisfaction of the conditions set forth herein, Landlord agrees to lease to Hardee's, and Hardee's agrees to lease from Landlord, [the Site] ..." (Ground Lease, ¶ 1.1). Under the heading "Conditions Precedent," the Ground Lease further provides in part:

4.1 Hardee's agreement to lease the Premises is subject to all of the following conditions precedent being satisfied on or before the One Hundred Eightieth (180th) day after the last execution hereof ...

. . . . .

(C) Hardee's obtaining, at its sole cost, satisfactory soil tests and determining that the soil or ground is free from contamination and is otherwise suitable for constructing the improvements contemplated by Hardee's herein.

Under a separate section of the Ground Lease with the heading "Soil Testing," Hardee's obligation to conduct soil testing is set forth in more detail:

2A.1 (A) ... Hardee's shall order soil ·tests, including but not limited to geotechnical and contamination studies of the Premises....

(B) Within thirty (30) days of the written soil test results, Hardee's shall determine whether to: a) terminate the Lease on account of unacceptable soil conditions; b) perform further tests; or c) proceed with clearing the other conditions precedent contained herein.

. . . . .

(D) In the event that Tenant elects to proceed with clearing the other conditions precedent, Hardee's shall deliver to Landlord a copy of the soil report which will set forth the remedial actions which must be taken to make the soil suitable for Hardee's purposes and meet the soil and ground water requirements as established by the Missouri EPA.

The Ground Lease between Hardee's and K.C.1986 was fully executed on June 15, 1989. (See Ground Lease, ¶ 29). Pursuant to the terms of the Ground Lease,

Hardee's, its representatives, agents, and contractors, [were granted] the right to enter upon the Premises to make soil tests, provided that Hardee's hereby agrees to reasonably restore any damage caused by the soil tests. Landlord agrees that Hardee's shall not bear any liability arising through the discovery of hazardous waste conditions and its compliance with all laws relating to the disclosure of any adverse findings. Hardee's agrees to reasonably restore any such damage caused by such soil tests and will defend and hold Landlord harmless from claims, liens and expenses or damages arising out of the acts of Hardee's, its representatives, agents,

and contractors in performing the soil tests.

(Ground Lease, ¶ 2.1(B)). While the right to enter the Site consistent with the above provision commenced upon the execution of the Ground Lease, Hardee's asserts that the lease itself never materialized because Hardee's terminated the Ground Lease, pursuant to ¶ 2A.1, prior to the date of commencement of the lease term. The Ground Lease provides that "The 'Commencement Date' of the Term shall be the date which Hardee's takes possession of the Premises for the purpose of constructing the improvements contemplated herein." (Ground Lease, ¶ 6.1). In addition to granting Hardee's the right to terminate the lease under certain conditions, the lease provides, "If Hardee's effectively terminates this Lease, then Hardee's shall pay to Landlord the sum of $100,000 as liquidated damages." (Ground Lease, ¶ 2A.1(H)).

On September 5, 1989, Terracon issued its preliminary environmental assessment of the Site, stating that "... [e]levated levels of several contaminants have been detected in the soil and groundwater samples collected at the site, which we feel will require further exploratory efforts and, most likely, remedial actions...." Hardee's forwarded the preliminary environmental assessment to K.C.1986 under cover of letter dated September 8, 1989. Terracon issued its final report outlining its environmental assessment of the Site on September 22, 1989. That same day, Hardee's notified K.C.1986 by certified mail of its election to terminate the Ground Lease as a result of the contamination uncovered incident to Terracon's investigation. Terracon's final report was provided to K.C.1986 on October 9, 1989. The report advised K.C. 1986 that the owner of the Site was required to notify the Missouri Department of Natural Resources ("Mo DNR") of Terracon's finding of contamination, and that if it failed to do so, Terracon would be required to report its findings to the Mo DNR.

As part of its investigation, Terracon installed monitoring wells at the Site in 1989. Hardee's employees did not instruct Terracon regarding the manner of installing the monitoring wells. There is a dispute as to whether those monitoring wells contributed

to the contamination of the regional alluvial aquifer beneath the Site. Contaminants, such as arsenic which was found in levels at the Site requiring remedial action, naturally migrate downward through soil. The rate of migration is affected by the amount of precipitation and the porosity and permeability of the soil. In contrast to natural migration of substances through soil, Borax asserts that because Terracon screened monitoring wells 1, 2 and 5 through the near-surface groundwater zone, high concentrations of arsenic were released directly to the top of the regional aquifer, and the arsenic loading to the regional aquifer beneath the Site was increased by 17 percent. Borax also argues that the conduits created by Terracon's monitoring wells have allowed concentrations of arsenic and other contaminants to migrate from the more highly contaminated clay into the less contaminated underlying sand aquifer. According to Terracon, its monitoring wells "did not cause a substantial increase in arsenic contamination" at the Site. Terracon asserts that its wells "were constructed in accordance with the standard of care in the community in the Greater Kansas City area that existed in 1989" and that they are "similar in design to monitoring wells installed and paid for by Borax and K.C.1986."

Terracon's final report recommended "that the five monitor wells be properly abandoned at the site, including removing the PVC casing and filling the boreholes with appropriate material." After the Ground Lease was terminated, Hardee's sent K.C.1986 a letter dated November 21, 1989, in which it offered to cap or in some form remove the monitoring wells installed on the property by Terracon. According to Hardee's, K.C.1986 did not respond. Terracon again informed K.C.1986 that it considered itself under an obligation to inform the Mo DNR of the contamination at the Site if K.C.1986 did not do so. Accordingly, by letter dated December 20, 1989, Terracon notified the Mo DNR of its findings of contamination at the Site. In 1990, K.C.1986's real estate agent replaced the locks on the monitoring wells at the request of K.C.1986. In September 1993, the Mo DNR and K.C.1986 entered a Consent Agreement requiring K.C.1986 to prepare and implement a remedial action plan for the Site. K.C.1986

did not properly abandon the monitoring wells installed by Terracon until September 1995.

## II. Summary Judgment Standard

The standard for granting summary judgment is well established. Rule 56 of the Federal Rules of Civil Procedure provides that a moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Reliance Ins. Co. v. Shenandoah South, Inc.,* 81 F.3d 789, 791 (8th Cir.1996). The moving party carries the initial burden of informing the district court of the basis for the motion and identifying the portions of the record which demonstrate a lack of a genuine issue for trial. *Hartnagel v. Norman,* 953 F.2d 394, 395 (8th Cir.1992); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "When the moving party has carried its burden under Rule 56(c), [the] opponent [of the Motion] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The opposing party is required to designate specific facts from which a reasonable juror could return a verdict in its favor. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

When considering a motion for summary judgment, a court must scrutinize the evidence in the light most favorable to the nonmoving party, and the nonmoving party "must be given the benefit of all reasonable inferences." *Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp.,* 950 F.2d 566, 569 (8th Cir.1991) *(citation omitted ).*

## III. Discussion

### A. *Claims Premising Hardee's Liability on the Doctrine of Respondeat Superior*

■ Borax and K.C.1986 premise Hardee's liability for many of their claims on the

doctrine of respondeat superior,[1] under which a principal is vicariously liable for the acts of its agent. In its motion for summary judgment, Hardee's argues that Terracon was an independent contractor, not an agent of Hardee's, precluding application of the doctrine of respondeat superior and absolving Hardee's of vicarious liability for Terracon's acts. Borax counters with the argument that the acts allegedly giving rise to liability in the instant case constitute nondelegable duties for which Hardee's is liable regardless of Terracon's status as an independent contractor. Further, K.C.1986 argues that Hardee's is contractually obligated to indemnify it against any claim, harm or liability arising from the acts of Terracon.

### 1. Independent Contractor

■ Under the doctrine of respondeat superior, Missouri law generally holds a principal liable to third parties for the acts or omissions of its agents. *Bass v. Kansas City Journal Post Co.*, 347 Mo. 681, 148 S.W.2d 548, 551 (1941). Missouri law distinguishes, however, between an agent and an independent contractor. *Greco v. ABC Transnational Corp.*, 623 F.Supp. 104, 105 (E.D.Mo.1985). Someone who hires an independent contractor generally is not held liable for the acts or omissions of the independent contractor. *See Greco*, 623 F.Supp. at 105.

■ Borax and K.C.1986 contend that Terracon acted as Hardee's agent, while Hardee's argues that it hired Terracon as an independent contractor. An independent contractor is one "who contracts with another to do something for him, but who is not controlled by the other with respect to his physical conduct in the performance of the undertaking." *Corder v. Morgan Roofing Co.*, 350 Mo. 382, 166 S.W.2d 455, 457 (1942) (citing Restatement of Agency § 239). The

essential difference is that "one who has work performed by an agent or servant is in a position to exercise more or less detailed control over the manner in which the work is done. The employer of an independent contractor, on the other hand, controls only the final result and not the manner by which it is accomplished." *Bass*, 148 S.W.2d at 552. To distinguish between an agent and an independent contractor, Missouri courts consider the following factors:

(a) The extent of control which, by the agreement, the master may exercise over the details of the work; (b) whether or not the one employed is engaged in a distinct occupation or business; (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision; (d) the skill required in the particular occupation; (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; (g) the method of payment, whether by the time or by the job; (h) whether or not the work is a part of the regular business of the employer; and (i) whether or not the parties believe they are creating the relationship of master and servant.

*Mattan v. Hoover Co.*, 350 Mo. 506, 166 S.W.2d 557, 564 (1942) (quoting Restatement of Agency § 220). No single factor is dispositive of the outcome, and each must be given weight in accordance with the circumstances of the particular situation. *Bass v. Kansas City Journal Post Co.*, 347 Mo. 681, 148 S.W.2d 548, 552 (1941). The ultimate issue to be considered, however, is whether the employer has the right to control the details of the other's work. *Merick Trucking, Inc. v. Missouri Div. of Employment Sec., Labor and Indus. Relations Comm'n of Mo.*, 902

---

1. While Borax and K.C.1986 do not expressly identify which claims are premised on the doctrine of respondeat superior, it appears they are asserting that all counts other than Counts I, II, III, IV, and X are premised on the doctrine of respondeat superior. For example, Borax premises Hardee's liability under Count VI (contribution), Count VII (indemnity) and Count VIII (unjust enrichment) on the assertion that Hardee's "is liable because they are past owners/operators of the Site and they caused the disposal of some

or all of the hazardous substances alleged to be present at the Site." (Amended Cross-claim, ¶ 66, 71, and 78). It is clear from the factual background contained in the Amended Cross-claim that Hardee's liability is based on contamination from the monitoring wells installed by Terracon. (Amended Cross-claim, ¶ 20). Accordingly, Borax's theory of liability against Hardee's under Counts VI, VII and VIII of its Amended Cross-claim appears to be premised on a finding that Hardee's is vicariously liable for Terracon's acts.

S.W.2d 871, 873 (Mo.App.1995); *Gardner v. Simmons,* 370 S.W.2d 359, 362 (Mo.1963).

■ Hardee's and Terracon entered into a contract which specifically provides that:

> Contractor shall perform all work diligently, carefully and in a good and workmanlike manner; shall furnish all labor, supervision, machinery, equipment, materials and supplies necessary therefor ... Contractor shall conduct all operations in Contractor's own name and as an independent contractor, and not in the name of, or as an agent for Hardee's.

(Contract, ¶ 10). While Terracon and Hardee's characterization of their relationship as an employer/independent contractor is not dispositive of the issue before the Court, it is probative of the intended nature of the relationship. *See Farm Bureau Co-op. Mill & Supply, Inc. v. Blue Star Foods,* 137 F.Supp. 486, 492 (W.D.Mo.1956), *aff'd,* 238 F.2d 326 (8th Cir.1956); *Empson v. Missouri Highway & Transp. Comm'n,* 649 S.W.2d 517, 521 (Mo.App.1983) (citing *Northern v. McGraw–Edison Co.,* 542 F.2d 1336, 1343 (8th Cir.1976), *cert. denied sub nom. McGraw Edison v. Soper,* 429 U.S. 1097, 97 S.Ct. 1115, 51 L.Ed.2d 544, *reh'g denied,* 430 U.S. 960, 97 S.Ct. 1612, 51 L.Ed.2d 812 (1977)). According to the provisions of the contract, Terracon was to "furnish all labor [and] supervision" to carry out the environmental assessment, indicating that Hardee's had little control over the details of Terracon's work once the scope of it was agreed to between the parties. This same provision indicates that Terracon supplied its own "machinery, equipment, materials and supplies" and that Terracon and Hardee's intended Terracon to act as an independent contractor.

Other factors relevant to Terracon's status also weigh in favor of finding that Terracon acted as an independent contractor in preparing its environmental assessment of the Site. For instance, environmental consulting is a distinct business which requires special training and education. Compensation for the job was negotiated before the project began, and Terracon was paid based on the job performed rather than by the hour. There has been no evidence proffered that Terracon remained employed by Hardee's in any capacity after its obligations under the contract at issue in this case were fulfilled. Nor has any evidence been proffered suggesting that conducting environmental assessments is part of Hardee's regular business. To the contrary, the evidence currently before the Court suggests that Hardee's retained Terracon because Hardee's lacked the requisite skills to conduct an adequate environmental assessment of the Site.

It is the burden of K.C.1986 and Borax to establish that a principal/agent relationship existed between Hardee's and Terracon. *See Empson,* 649 S.W.2d at 521 ("the burden of establishing [an existing agency] is on the party alleging the existence of the agency"). Because the Court finds that an analysis of the undisputed facts leads only to the conclusion that Terracon performed the environmental assessment of the Site as an independent contractor of Hardee's, summary judgment consistent with that finding is appropriate. *See Smoot v. Marks,* 564 S.W.2d 231, 236 (Mo.App.1978); *Greco,* 623 F.Supp. at 106. The finding that Terracon acted as an independent contractor of Hardee's, however, does not mandate a finding that summary judgment is appropriate in favor of Hardee's on all claims asserted by Borax and K.C.1986 which premise Hardee's liability on the doctrine of respondeat superior. *See Bass,* 148 S.W.2d at 552 (when certain special circumstances exist, "one who has employed an independent contractor may become liable for the latter's tort").

### 2. *Non–Delegable Duty Doctrine*

■ The established rule for determining landowner liability for acts done by an independent contractor is that:

> a landowner has no vicarious liability for the torts of an independent contractor. This general rule recognizes that the landowner has no right of control over the manner in which the work is to be done, and for that reason the work "is to be regarded as the [independent] contractor's own enterprise and he, rather than the [landowner], is the proper party to be charged with the responsibility for pre-

venting the risk and administering and distributing it."

*Zueck v. Oppenheimer Gateway Properties,* 809 S.W.2d 384, 386 (Mo.1991) (quoting W. Prosser & W. Keaton, The Law of Torts, 509 (5th ed.1984)). An exception to the general rule exists where the work performed by the independent contractor constitutes an inherently dangerous activity. *Mallory v. Louisiana Pure Ice & Supply Co.,* 320 Mo. 95, 6 S.W.2d 617, 624 (Mo.1928); *Zueck,* 809 S.W.2d at 386. The purpose of the non-delegable duty exception "is to prevent the landowner, for whose benefit the work is being done, from avoiding liability and defeating the recovery of an injured, innocent third party, by hiring a contractor who is not fiscally responsible to do the dangerous work." *Zueck,* 809 S.W.2d at 386.

■ To establish the applicability of the non-delegable duty exception, the plaintiff must show that "(1) performance of the contract necessarily involves some inherently dangerous activity; [and] (2) the activity which caused the damage was reasonably necessary to the performance of the contract and was inherently dangerous ..." *Smith v. Inter–County Tel. Co.,* 559 S.W.2d 518, 523 (Mo.1977).[2] The Missouri Supreme Court explained how to determine whether an activity is inherently dangerous:

> "The distinction seems to be that if the doing of the work necessarily causes danger which must be guarded against, then the employer must see to it that such dangers are guarded against and cannot relieve himself by casting this duty on an independent contractor. If, however, the work is dangerous only by reason of negligence in doing it, then the liability falls only on the independent contractor. In the one case the doing of the work creates danger and requires active care to counteract the danger. In the other there is no danger unless created by negligence. The one starts with danger and requires preventive care to make safety, while the oth-

er starts with safety and requires negligence to make danger."

*Mallory,* 6 S.W.2d at 624 (quoting *Carson v. Blodgett Constr. Co.,* 189 Mo.App. 120, 174 S.W. 447, 448 (1915)). The Court further explained:

> "The injury need not be a necessary result of the work, but it is sufficient that it will be a probable result of the work if proper precautions to guard against injury are not taken. However, the work must be such as will probably, and not which merely may, cause injury if proper precautions are not taken. If the work is of such a nature that it could be done without probable injury to any one except in the event of negligence in the manner of doing it, no liability attaches to the employer."

*Mallory,* 6 S.W.2d at 624 (quoting 39 C.J. 1331).

■ Applying the definition of inherent danger first requires identifying "the work" and "the danger" which must be guarded against. The work is typically defined as the specific act engaged in by the independent contractor rather than the general nature of the work. For example, in *Mallory,* an employee of an excavating company was injured when a wall fell on him. *Mallory,* 6 S.W.2d at 619. The landowner argued that it was not liable for plaintiff's injury because the general contractor was an independent contractor responsible for any harm which occurred. *Mallory,* 6 S.W.2d at 623. In turn, the general contractor argued that the excavation company was an independent contractor responsible for the harm. *Mallory,* 6 S.W.2d at 621. The work was defined by the court as "excavating land underneath the wall which ultimately collapsed in accordance with the method prescribed by the general contractor and assented to by the landowner." *Mallory,* 6 S.W.2d at 622. Notably, the court did not define the work in terms of general excavation. *See also, Smith,* 559 S.W.2d at 523 (work described as: "insertion

**2.** *Smith* also required the plaintiff to establish that "(3) the one contracting with the independent contractor negligently failed to insure that adequate precautions were taken to avoid damage by reason of the inherently dangerous activity; and (4) plaintiff's damage was a direct result

of such negligence." *Smith,* 559 S.W.2d at 523. That portion of *Smith* has since been overruled, and such a showing is no longer required. *See Ballinger v. Gascosage Elec. Co-op.,* 788 S.W.2d 506, 509 (Mo.1990); *Zueck,* 809 S.W.2d at 387, 391.

of the pipe under the road at a substantial depth; that the walls of the trench in which plaintiff was injured were vertical, not sloped; that the ditch at that point was between 6 and 12 feet deep; and that there was no shoring or bracing of any kind"); *Loth v. Columbia Theater Co.*, 197 Mo. 328, 94 S.W. 847, 848 (1906) (work was to lower a sign in order to change its lettering). In the case at hand, Borax characterizes the work as installing monitoring wells, whereas Hardee's characterizes the work as general environmental inspection. Based on the relevant case law, it is the opinion of this Court that "the work" which Borax argues was inherently dangerous was installing monitoring wells into an area with known soil contamination and suspected ground water contamination.

Borax asserts that the work performed by Terracon is inherently dangerous. Borax argues that *Shockley v. Hoechst Celanese Corp.*, 793 F.Supp. 670, 675 n. 4 (D.S.C.1992), *modified on other grounds*, 996 F.2d 1212 (Table), 1993 WL 241179 (4th Cir.), *Dickerson, Inc. v. Holloway*, 685 F.Supp. 1555, 1566 (M.D.Fla.1987), *aff'd sub nom. Dickerson v. United States*, 875 F.2d 1577 (11th Cir.1989) and *Graham v. Canadian Nat'l Ry. Co.*, 749 F.Supp. 1300, 1320 (D.Vt.1990) stand for the proposition that "in the context of hazardous waste, courts in other jurisdictions have had no difficulty imposing liability on the contracting party" by applying the non-delegable duty doctrine. (Opp. at 3). While this statement may be literally accurate, the Court will not overlook the distinction drawn by Hardee's, that "[e]ach of these cases cited by Borax involved situations in which an employer knowingly contracted with an independent contractor for the *intentional* disposal or discharge of hazardous substances." In the case at hand, Hardee's did not contract for intentional disposal, removal, transportation or other activity associated with hazardous waste that necessarily would have required extensive precautions. Rather, Hardee's contracted for sampling and testing to determine the extent of contamination. While this activity necessarily carries with it the potential to contact and disturb hazardous waste, it is not a foregone conclusion that such will be the case, as it is in the case

examples cited by Borax. This distinction is sufficient to preclude a finding that the aforementioned cases support a finding at the summary judgment stage that Hardee's was involved in an inherently dangerous activity.

Based on the agreement between Hardee's and Terracon, installing monitoring wells was reasonably necessary to Terracon fulfilling its duties. Whether installing monitoring wells through soil known to be contaminated to some degree in order to test ground water is an inherently dangerous activity poses a genuine issue of material fact more appropriately resolved at trial. *See Nance v. Leritz*, 785 S.W.2d 790, 792 (Mo.App.1990) (citing *Floyd v. Benson*, 753 S.W.2d 945 (Mo.App. 1988)). Accordingly, summary judgment in favor of Hardee's dismissing all claims in which Hardee's liability is premised on the doctrine of respondeat superior must be denied.

### 3. *Contractual Indemnity to K.C.1986*

K.C.1986 argues in its Opposition that if the Court grants Hardee's motion for summary judgment, Hardee's nonetheless must remain a defendant in the case because Hardee's did not move for summary judgment on Count X of K.C.1986's Second Amended Complaint asserting a claim for contractual indemnity. The Court disagrees that Hardee's did not move for summary judgment on K.C.1986's claim for contractual indemnity. Hardee's Motion for Summary Judgment (Doc. # 450) explicitly states that Hardee's seeks "summary judgment in its favor on all claims asserted against it in this action," which would include Count X of K.C.1986's Second Amended Complaint asserting a claim for contractual indemnity.

■ K.C.1986 bases its claim for contractual indemnity on ¶ 2.1B of the Ground Lease, which grants:

> Hardee's, its representatives, agents, and contractors the right to enter upon the Premises to make *soil tests*, provided that Hardee's hereby agrees to reasonably restore any damage caused by the *soil tests*. Landlord agrees that Hardee's shall not bear any liability arising through the discovery of hazardous waste conditions and its compliance with all laws relating to the

disclosure of any such damage caused by such *soil tests* and will defend and· hold Landlord harmless from claims, liens and expenses or damages arising out of the acts of Hardee's, its representatives, agents, and contractors in performing the *soil tests.*

(emphasis added). Hardee's argues that the contractual· indemnity provision applies only to "acts ... in performing the soil tests," and does not apply to the installation of groundwater monitoring wells. While it is undisputed that the contract does not specifically provide for testing groundwater, the Court notes that the Ground Lease does provide that "Hardee's shall deliver to Landlord a copy of the soil report which will set forth ·the remedial actions which must be taken to make the soil suitable for Hardee's purposes and meet the soil *and ground water* requirements as established by the Missouri EPA." (Ground Lease, ¶ 2A.1(D) (emphasis added)).

 To find a contractual obligation to indemnify another party, the contract language setting forth the agreement to indemnify must be "clear and unequivocal." *Coello v. Tug Mfg. Corp.,* 756 F.Supp. 1258, 1263 (W.D.Mo.1991); *Parks v. Union Carbide Corp.,* 602 S.W.2d 188, 188–89 (Mo.1980); *Linsin v. Citizens Elec. Co.,* 622 S.W.2d 277, 281 (Mo.App.1981). Based on the contract language, plausible arguments exist to support either the finding that Hardee's agreed to "defend and hold Landlord harmless from claims, liens and expenses or damages" resulting from acts related only to soil testing or the finding that Hardee's agreed to "defend and hold Landlord harmless from claims, liens and expenses or damages" resulting from any acts related to the environmental assessment of the Site. Because the provisions of the contract do not clearly and unambiguously set forth the boundaries of Hardee's agreement to "defend and hold harmless" K.C.1986, summary judgment on this issue is inappropriate.

 Hardee's also argues that any contractual indemnity obligation it may have had was discharged in 1990 when K.C.1986 instructed its real estate agent to remove

Terracon's locks on the monitoring wells and replace them with its own locks. Under Missouri law, "any act[s] on the part of any indemnitee which materially increases the risk, or prejudices the rights, of the indemnitor, will discharge the indemnitor under the contract of indemnity." *Holiday Inns, Inc. v. Thirteen–Fifty Inv. Co.,* 714 S.W.2d 597, 603 (Mo.App.1986) (quoting *Hiern v. St. Paul–Mercury Indem. Co.,* 262 F.2d 526, 529 (5th Cir.1959) (citations omitted)). The act (installing monitoring wells) which allegedly caused increased contamination was committed prior to the locks being changed in 1990. While changing the locks may arguably have prevented Hardee's or Terracon from mitigating any damage caused by installing the monitoring wells in the first place, it did not increase the risk of initial spread of contamination or the hazards associated therewith. Because Hardee's has not established that changing the locks in 1990 increased its risk or prejudiced its rights, that act did not dissolve any contractual indemnity obligation incurred by Hardee's under the Ground Lease.

### B. *CERCLA Liability*

 CERCLA imposes liability for response costs incurred in remedying environmental hazards posed by hazardous waste sites, 42 U.S.C. § 9607, and allows liable parties to seek contribution from other liable parties. 42 U.S.C. § 9613. The primary purpose of CERCLA is "to encourage quick response and to place the cost of that response on those responsible for the hazardous conditions." *Control Data Corp. v. S.C.S.C. Corp.,* 53 F.3d 930, 936 (8th Cir. 1995). Accordingly, CERCLA § 107(a)(2) provides that "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, ... shall be liable." 42 U.S.C. § 9607(a)(2). Hardee's seeks summary judgment that it is not liable under CERCLA for response costs incurred in cleaning up hazardous substances at the Site. In its cross-motion, Borax seeks summary judgment that Hardee's is liable for such response costs.[3]

---

3. In its Second Amended Complaint, K.C.1986

does not assert a cause of action against Har-

■ To establish liability under CERC-LA, "a plaintiff must show that a defendant is within one of the four classes of covered persons enumerated in [42 U.S.C. § 9607(a)]." *Control Data,* 53 F.3d at 934. Borax contends that Hardee's falls within the second class of covered persons enumerated in 42 U.S.C. § 9607(a)(2): "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." In response, Hardee's argues that it is not a "covered person" because it has never owned or operated the Site, and if the Court finds that Hardee's has owned or operated the Site, no hazardous substance was disposed of during its ownership or operation of the Site.

### 1. *Disposal*

■ For CERCLA liability to attach to Hardee's, it must have "disposed" of hazardous waste. CERCLA incorporates the definition of "disposal" provided in the RCRA:

> The term "disposal" means the discharge, deposit, injection, dumping, spillage, leaking, or placing of any solid waste as hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any water, including ground waters.

42 U.S.C. § 6903(3). Whether disposal of hazardous waste occurred during the time Hardee's is alleged to have owned or operated the Site is disputed by the parties. Hardee's hired Terracon to conduct a pre-acquisition soil investigation. Borax argues that Terracon disposed of hazardous waste when it constructed monitoring wells as part of its pre-acquisition investigation, making both Terracon and Hardee's strictly liable. According to Borax, the wells increased the natural rate of contaminant migration, caus-

ing groundwater contamination and increasing the pre-existing soil contamination.[4]

■ The definition of disposal does not quantify the amount of hazardous substance involved in the act. *See CDMG,* 96 F.3d at 719 ("There is no exception for de minimus disturbances. [citations omitted] The fact that a defendant's disposal of contaminants is trivial may provide a ground to allocate loss liability to that defendant, but it is not a defense to liability"); *see also Stewman,* 993 F.2d at 649 ("there is no minimum quantitative requirement to establish a release or threat of release of a hazardous substance under CERCLA") (citing *Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 668–69 (5th Cir. 1989)). Neither is it material for purposes of CERCLA liability that the act complained of is the only or the initial introduction of hazardous material to the Site. *See Kaiser Aluminum & Chem. Corp. v. Catellus Dev. Corp.,* 976 F.2d 1338, 1342–43 (9th Cir.1992) ("CERCLA's definition of 'disposal' expressly encompasses the 'placing of any ... hazardous waste ... on any land.' 42 U.S.C. § 6903(3). Congress did not limit the term to the initial introduction of hazardous material onto property"); *Tanglewood East Homeowners v. Charles–Thomas, Inc.,* 849 F.2d 1568, 1573 (5th Cir.1988) ("[T]his definition of disposal does not limit disposal to a one-time occurrence—there may be other disposals when hazardous substances are moved, dispersed, or released during landfill excavations and fillings"); *Acme Printing Co.,* 870 F.Supp. at 1480 (Defendant liable for release of hazardous substance where excavation of site caused barrels of waste to be unearthed and ruptured).

Whether Terracon's construction of monitoring wells increased the rate of contaminant migration is a question of fact which will require credibility determinations of the parties' expert witnesses at trial. The Court finds that based on the evidence before it, a genuine issue of material fact exists as to whether a disposal of hazardous substances

dee's under CERCLA.

4. Hardee's argues that CERCLA's innocent owner defense mandates that it not be held liable under CERCLA "unless the dispersal of contaminants is coupled with negligent conduct during the assessment." (Sugg. in Supp. at 15 (citing

*United States v. CDMG Realty Co.,* 96 F.3d 706 (3rd Cir.1996))). As set forth in detail in this Court's Order disposing of Terracon's Motion for Summary Judgment, the Court declines to follow the holding in *CDMG.*

occurred during the period of time Hardee's is alleged to have owned or operated the Site. Accordingly, summary judgment on this point must be denied.

## 2. *Owner*

▮▮▮ Hardee's asserts it never owned the Site, while Borax asserts that Hardee's was deemed an owner for purposes of CERCLA because of its leasehold interest. Lessees are considered owners for purposes of determining CERCLA liability. See, e.g., *U.S. v. Mexico Feed and Seed Co., Inc.,* 980 F.2d 478, 484(8th Cir.1992); (lessee was owner and operator of land); *United States v. South Carolina Recycling and Disposal, Inc.,* 653 F.Supp. 984, 1003, n. 2 (D.S.C.1984), *modified on other grounds sub nom. United States v. Monsanto Co.,* 858 F.2d 160 (4th Cir.1988).

The parties dispute whether Hardee's ever acquired a leasehold interest in the Site. Hardee's argues that the Ground Lease it entered was merely an agreement to lease upon the occurrence of certain conditions precedent, which never occurred. Borax, on the other hand, argues that the Ground Lease Hardee's entered was an actual lease with the option to terminate upon the failure of certain conditions subsequent. Although the Ground Lease specifically refers to "conditions precedent," it also refers to termination of the agreement and contains other provisions indicating Hardee's is bound by the Ground Lease. Even though the Ground Lease provided that the lease term did not commence until the occurrence of certain conditions precedent, Hardee's did have the right to enter the Site and perform whatever environmental investigation it chose as soon as the Ground Lease was executed. There is no evidence that K.C.1986 dictated the terms or was involved in negotiating the scope of work to be performed by Terracon. Further, although Hardee's had the right to terminate the Ground Lease, Hardee's was required to pay liquidated damages in the event it chose to exercise that right. Having reviewed the terms of the Ground Lease, the Court finds that it is ambiguous as to whether Hardee's was a lessee of the Site at the time Terracon performed its environmental assessment. Summary judgment therefore cannot be granted for or against any party based on Hardee's holding an actual leasehold interest in the property.

▮▮▮ Borax further argues that even if Hardee's was not a lessee at the time of Terracon's activities, it did have an equitable interest in the Site, which is sufficient for Hardee's to be deemed an "owner" for purposes of CERCLA. Hardee's did not respond to this argument. Under Missouri law, "an equitable title is the right in the party to whom such title belongs to have the legal title transferred to him upon the performance of a specified condition." *Reinhold v. Fee Fee Trunk Sewer, Inc.,* 664 S.W.2d 599, 603 (Mo.App.1984) (citing *State ex rel. City of St. Louis v. Baumann,* 348 Mo. 164, 153 S.W.2d 31 (1941)). By citing case law regarding equitable title, Borax is effectively arguing that Hardee's held an equitable lease at the time of Terracon's acts by virtue of the terms of the Ground Lease. Equitable title passes to the prospective purchaser once the right to redeem title is vested in the prospective purchaser. *Baumann,* 153 S.W.2d at 35 ("The right to call in the legal title ordinarily presupposes an equitable title in the person who may exercise the right"). Entering a contract itself does not transfer equitable title where another party can effectively terminate the contract by performing an act solely with its control. *Baumann,* 153 S.W.2d at 34. In such a case, the prospective purchaser has an inchoate title to the land. *Baumann,* 153 S.W.2d at 34. For example, in *Baumann,* the City acquired a certificate of purchase of certain real estate through a tax sale. *Baumann,* 153 S.W.2d at 33. Pursuant to Missouri statute, the party delinquent in taxes had two years to redeem the land by paying the back taxes. *Baumann,* 153 S.W.2d at 33. If no one redeemed the land during the two-year period, the holder of the certificate of sale became entitled to a deed to the property upon presentation of the certificate to the collector. *Baumann,* 153 S.W.2d at 34. During the redemption period, the City had only an inchoate title to the land. *Baumann,* 153 S.W.2d at 34. Once the redemption period expired, it acquired equitable title to the land because it needed only to present its certifi-

cate of purchase to acquire legal title. *Baumann,* 153 S.W.2d at 34. Where the law of the state in which the property is located recognizes the doctrine of equitable title, it has been applied to find "ownership" under CERCLA. See, e.g., *United States v. Wedzeb Enters., Inc.,* 809 F.Supp. 646, 652 (S.D.Ind.1992).

Hardee's and K.C.1986 entered into the Ground Lease, which provides that the lease agreement is "[s]ubject to the satisfaction of the conditions set forth herein ..." (Ground Lease, ¶ 1.1). In addition to conditions set forth throughout the Ground Lease, ¶ 4 enumerates certain "conditions precedent" to which Hardee's agreement to lease the Site is subject. Because the failure of one of the conditions set forth in ¶ 4 precipitated Hardee's notice of termination of the Ground Lease, the parties focus on the conditions outlined in ¶ 4 in their arguments regarding the status of Hardee's interest in the Site. While Hardee's has the obligation to perform the "conditions precedent" set forth in ¶ 4, other conditions contained in the Ground Lease require K.C.1986 to act. (See, e.g., ¶ 4A.1). Once the Ground Lease was entered, Hardee's acquired an inchoate interest in the leasehold. That inchoate interest would turn into an equitable interest upon K.C.1986 satisfying all of the conditions in the Ground Lease requiring it to act. At that time, Hardee's "would have the right to have the legal title transferred to [it] upon the performance of specified conditions." *Baumann,* 153 S.W.2d at 35. The parties have not provided the Court information sufficient to determine whether Hardee's ever gained an equitable interest in the Site and, if it did, whether that interest was gained prior to Terracon installing the monitoring wells. Whether Hardee's was an owner of the Site at the time of disposal, either by holding a leasehold interest or an equitable leasehold interest in the Site, presents a genuine issue of material fact.

### 3. *Operator*

 Even if Hardee's is found not to have been an owner of the Site at the time of Terracon's activities, it may nonetheless be liable under CERCLA if it was an operator. The Eighth Circuit has held that

> an individual may not be held liable as an 'operator' under § 9607(a)(2) unless he or she (1) had authority to determine whether hazardous wastes would be disposed of and to determine the method of disposal and (2) actually exercised that authority, either by personally performing the tasks necessary to dispose of the hazardous wastes or by directing others to perform those tasks.

*United States v. Gurley,* 43 F.3d 1188, 1193 (8th Cir.1994), *cert. denied,* 516 U.S. 817, 116 S.Ct. 73, 133 L.Ed.2d 33 (1995) (individual employee of waste reclamation company, who was not an officer, director or shareholder of the company, was found liable as an operator under CERCLA).[5] Whether Hardee's was an operator of the Site requires an analysis of the totality of the circumstances surrounding its involvement at the Site. *Gurley,* 43 F.3d at 1195 ("An individual defendant's responsibility for the disposal of hazardous waste should be judged on a case-by-case bases"). Although Hardee's did not control the manner in which Terracon carried out its environmental investigation, it did control the nature and scope of the work to be done. Hardee's had apparently unlimited access to the Site after it entered the Ground Lease and was expressly granted the authority to design and carry out an environmental assessment of the Site. Hardee's negotiated the contract with Terracon and approved of Terracon installing monitoring wells. While Hardee's did not actually perform the environmental investigation, it did direct Terracon to perform it and, by negotiating the scope of work to be performed, it arguably directed Terracon to install the monitoring wells. Based on these facts, the Court finds that a genuine issue of material fact exists as to whether Hardee's was an operator of the Site at the time Terracon installed the moni-

5. In *United States v. TIC Investment Corp.,* 68 F.3d 1082 (8th Cir.1995), the Eighth Circuit indicated that a different test to determine operator liability than that articulated in *Gurley* may apply to various types of actions not relevant here.

*TIC,* 68 F.3d at 1089, n. 5, *cert. denied sub nom. Georgoulis v. United States,* —— U.S. ——, 117 S.Ct. 50, 136 L.Ed.2d 14 (1996). Absent further direction from the Eighth Circuit, the Court deems itself bound by the *Gurley* decision.

 

toring wells. Summary judgment declaring Hardee's never operated the Site is, therefore, improper. Because Borax bears the burden of proof on this issue, summary judgment declaring Terracon liable as an operator is also inappropriate.

### C. *RCRA Claim*

In its suggestions in support of summary judgment, Hardee's states that it joins in Terracon's suggestions regarding the RCRA without repeating the same. No party offers additional argument or factual basis for altering the Court's opinion set forth in the Order regarding Terracon's Motion for Summary Judgment. The Court notes that neither party asserts that Hardee's was ever given an RCRA notice. Accordingly, the Court finds that Hardee's is entitled to summary judgment on Borax's RCRA claim (Count III).

### D. *K.C.1986's Nuisance Claim*

Hardee's also states in its suggestions in support of its summary judgment that it adopts Terracon's suggestions regarding K.C.1986's nuisance claim. Neither party has offered argument or factual basis suggesting the Court should alter its opinion as set forth in its Order regarding Terracon's motion for summary judgment. Accordingly, the Court finds that Hardee's is entitled to summary judgment on K.C.1986's public nuisance claim (Count V).

For the foregoing reasons, it is hereby

ORDERED that Hardee's Motion for Summary Judgment (Doc. # 450) is

DENIED as to Counts I and II of Borax's Amended Cross–Claim (Doc. # 251) alleging CERCLA liability;

GRANTED as to Count III of Borax's Amended Cross–Claim (Doc. # 251) alleging a cause of action under the RCRA;

DENIED as to Counts IV, V, VI, VII and VIII of Borax's Amended Cross–Claim (Doc. # 251) alleging declaratory judgment, negligence, contribution, indemnity and unjust enrichment;

DENIED as to Counts III, IV, VII, VIII, IX and X of K.C.1986's Second Amended Complaint (Doc. # 142) alleging negligence,

strict liability for ultra-hazardous activities, contribution, indemnity, unjust enrichment and contractual indemnity; and

GRANTED as to Count V of K.C.1986's Second Amended Complaint alleging nuisance. It is further

ORDERED that U.S. Borax's Cross–Motion for Partial Summary Judgment against Hardee's (Doc. # 484) is DENIED.